IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02472-CMA-MJW

ERIN VOGEL, Plaintiff,

vs.

STANDARD   INSURANCE   COMPANY,   an
Oregon corporation, Defendant.

_____

### STANDARD INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

_____

Defendant Standard Insurance Company, through counsel and pursuant to Fed. R. Civ. P. 56, moves for summary judgment against Plaintiff Erin Vogel.

## I.      INTRODUCTION

This is an insurance coverage dispute.  On August 25, 2012, Plaintiff and her husband, Todd Vogel (the "Decedent"), went boating on Cherry Creek Reservoir with two other couples.  After it got dark at about 9:30 p.m., the group found that the boat anchor was stuck.  They tried to pull the anchor free using the boat's motor and discussed cutting the anchor line.  Instead of cutting the line, the Decedent decided to enter the water, swim down, and free the anchor.  The Decedent loosened the anchor, but sadly, did not resurface.  Rescue divers found his body two days later.

Plaintiff made a claim for Accidental Death and Dismemberment ("AD&D") benefits under a group life policy issued by Standard.  The policy excludes AD&D benefits if either the "**accident** or **loss**" resulting in the claim was "**caused** or **contributed** to" by "the voluntary use or consumption of any . . . alcohol or drug."  (**Ex.**

**1**, Attachment 1 to Affidavit of Rob Clark ("Clark Aff."), Group Life Insurance Policy, Bates No. STND 13-01951-00082) (emphasis added).)

Standard immediately investigated Plaintiff's claim by obtaining the death certificate, sheriff's reports, autopsy report, and toxicology report.  The toxicology report stated that the Decedent's blood alcohol concentration ("BAC") was 0.128, or more than 150% of the legal limit for drivers and boat operators in Colorado.  Moreover, the sheriff's reports stated that the boating party, including the Decedent, had consumed alcohol, made reference to the Decedent's level of intoxication, and advised that the five other members of boating party were noticeably intoxicated when first responders arrived.  The reports also stated that beer and tequila were on the boat.

Since Standard's initial investigation showed that the Decedent had been drinking, Standard obtained a medical opinion on what role, if any, alcohol may have played in the accident or death.  Dr. Steven Beeson concluded that it was likely that alcohol caused or contributed to the Decedent's accident or death because a person with a BAC like the Decedent's would experience a lack of judgment and loss of motor skills.  Following the receipt of that medical opinion, Standard denied coverage.

Plaintiff, through her lawyer, disagreed with Standard's decision, so Standard began an administrative review of its initial denial.  As part of its review, Standard interviewed the coroner and a sheriff's investigator, obtained the rescue divers' report, and reviewed witness statements other members of the boating party.  Standard also obtained a second medical opinion from a toxicology specialist.  Dr. Alan Weiner, the toxicologist, agreed with Dr. Beeson that alcohol caused or contributed to the accident

or death because Decedent would have experienced a lack of judgment and loss of motor skills.  Ultimately, Standard's review confirmed what Standard's earlier investigation had shown, i.e., that alcohol caused or contributed to the accident or death.  Standard advised Plaintiff's lawyer about its decision in April 2013.

Plaintiff filed this lawsuit in August 2013.  Discovery has further confirmed Standard's position.  Specifically, Standard obtained affidavits from two investigators, both of whom agreed that alcohol contributed to the Decedent's accident or death. Standard also obtained the report from a Colorado Parks & Wildlife officer who reported that there was a "strong odor of alcoholic beverage coming from the boat."  That officer also confirmed in his report that alcohol use was a "Contributing Factor" to the accident. Finally, Plaintiff's own toxicology expert testified that the Decedent was "intoxicated" and that based on his BAC it would be reasonable to conclude that the Decedent would be affected by his alcohol consumption.

Standard is therefore entitled to summary judgment on Plaintiff's bad faith claim because the undisputed facts show that Plaintiff's AD&D claim was at least fairly debatable. Thus, Standard did not act in bad faith when denying Plaintiff's AD&D claim.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Standard insured the Decedent under Standard Group Life Insurance Policy No. 645797-A (the "Policy").  (**Ex. 1**, Attachment 1 to Clark Aff., Group Life Insurance Policy, Bates Nos. STND 13-10951-00065 – 000100.)

2.    Plaintiff is the designated beneficiary under the Policy.  (**Ex. 1**, Attachment 2 to Clark Aff., Beneficiary Designation, Bates No. STND 13-01951-309.)

3.      The insuring clause of the AD&D section of the Policy states:

If you [i.e., the Decedent] or your Dependent have an accident, including accidental exposure to adverse conditions, while insured for AD&D Insurance, and the accident results in a Loss, we will pay benefits according to the terms of the Group Policy after we receive Proof Of Loss satisfactory to us.

(**Ex. 1**, Attachment 1 to Clark Aff., Insurance Policy, Bates No. STND 13-01951-00081.)

4.      The Policy contains an exception to AD&D coverage that states:

No AD&D Insurance benefit is payable if the ***accident or Loss*** is ***caused or contributed to*** by any of the following:

* * *

The voluntary use or consumption of any poison, chemical compound, alcohol or drug, unless used or consumed according to the directions of a Physician.

(**Ex. 1**, Attachment 1 to Clark Aff., Insurance Policy, Bates No. STND 13-01951-00082)

(emphasis added).)

5.      The Vogels and two other couples, Kimberly and Trevor Watrous and Andy and Janessa Dewett, went boating at Cherry Creek Reservoir on August 25, 2012 in the Dewetts' boat.  (Complaint ¶ 12.)

6.      Before arriving at the reservoir, the Decedent had more than one beer while working in his yard.  (**Ex. 2**, Plaintiffs' Responses to Standard's Discovery Requests, Interrogatory No. 3; **Ex. 3**, E. Vogel Deposition ("Vogel Dep.") at 15:21-17:8.)

7.      The boating party, including the Decedent, drank alcohol while on the boat.  (**Ex. 4**, Affidavit of Michael Garnsey ("Garnsey Aff.") ¶¶ 3 & 6; **Ex. 5**, Affidavit of Joni Gordanier ("Gordanier Aff.") ¶¶ 3 & 6; **Ex. 3,** Vogel Dep. at 20:16-21:9; **Ex. 6,** T.

Watrous Deposition ("Watrous Dep.") at 33:24-35:4; (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00259)

8.     The Decedent had at least one shot of tequila and some beer while on the boat. (**Ex. 6,** Watrous Dep. at 34:21-36:4.)

9.     The Sheriff's report states that the Decedent was probably more intoxicated that Mr. Watrous.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00254.)  Mr. Watrous had five or six drinks while on the boat. (**Ex. 6,** T. Watrous Dep. at 35:9-15.)

10.     When it got dark, the boating party attempted to return to the marina but the anchor was stuck.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00251; Complaint ¶ 13.)

11.     Ms. Dewett attempted to pull the anchor free using the boat's throttle, but that did not work.  (**Ex. 7**, State of Colorado Supplemental Report at Bates No. Vogel 000539; **Ex. 6**, T. Watrous Dep. at 48:14-49:1.)

12.     Some members of the party wanted to cut the anchor line, but the Decedent insisted he could free the anchor.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00256; **Ex. 6,** Watrous Dep. at 51:11-52:2.)

13.     The Decedent went overboard into the water in the middle of the reservoir to free the anchor.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00254.)  The anchor came loose but the Decedent did not resurface.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-00254.)

14.     When the party called 911 to report the accident, the caller admitted that members of the party had been drinking beers.  (**Ex. 1**, Attachment 4 to Clark Aff., Offense Report, Bates No. STND 13-01951-474.)

15.     Park Rangers arriving on the scene noted a strong odor of alcohol from the Dewetts' boat.  (**Ex. 8**, State of Colorado Case Report at Bates No. Vogel 000533.)

16.     Sheriff's investigators interviewed the boating party that night and found them to be intoxicated and emotional.  (**Ex. 4**, Garnsey Aff. ¶ 3; **Ex. 5**, Gordanier Aff. ¶ 3.)  The boating party was too drunk to drive home, so investigators drove them home.  (**Ex. 4**, Garnsey Aff. ¶ 10; **Ex. 5**, Gordanier Aff. ¶ 8.)

17.     Investigators found a beer can in the back of the boat where the Decedent was before entering the water, as well as several plastic cups and a bottle of tequila in the Dewetts' boat.  (**Ex. 1**, Attachment 4 to Clark Aff., Offense Report, Bates No. STND 13-01951-475; **Ex. 4**, Garnsey Aff. ¶ 6.)

18.     The toxicology report states that Decedent's BAC was 0.128.  (**Ex. 1**, Attachment 5 to Clark Aff., Toxicology Report, Bates No. STND 13-01951-242.)

19.     Plaintiff's expert, Sarah Urfer, agrees that the Decedent was intoxicated when he entered the water.  (**Ex. 9**, Deposition of S. Urfer ("Urfer Dep.") at 23:2-6.)

20.     Ms. Urfer also agrees that alcohol would have had an effect on the Decedent and that his BAC was sufficiently high that Standard could conclude that he was likely experiencing the clinical effects of ethanol intoxication at the time of his death.  (**Ex. 9**, Urfer Dep. at 66:25-67:5.)

21.     Ms. Urfer states that studies involving tens of thousands of humans have resulted a chart with a series of stages describing the effects of alcohol consumption on humans.  (**Ex. 9**, Urfer Dep. at 14:22-15:17.)

22.     Ms. Urfer states that the Decedent was likely within the "excitement" stage of intoxication and that persons in that stage experience "emotional instability, increased reaction time, sensory motor incoordination, impaired balance, slurred speech, vomiting and drowsiness."  (**Ex. 9**, Urfer Dep. at 19:25-20:12 & 23:7-11.)

23.     Ms. Urfer opines that the Decedent may also have experienced the effects described in the "euphoria" stage of intoxication.  Those effects include "sociability, talkativeness, increased self-confidence, decreased inhibitions, diminished attention, judgment and control, some sensory motor incoordination, slow information processing, loss of efficiency in critical performance tests."  (**Ex. 9**, Urfer Dep. at 23:17-25:8.)

24.     Ms. Urfer is unable to "make a call as to whether or not alcohol in [the Decedent's] system affected what – how he died."  (**Ex. 9**, Urfer Dep. at 28:9-20.)  Thus, Ms. Urfer opines that it is possible that the Decedent's decision to swim down and free the anchor at night was the result of impaired judgment.  (**Ex. 9**, Urfer Dep. at 60:11-18.)

25.     Sheriff's investigators interviewed witnesses at the scene and concluded that the Decedent's consumption of alcohol contributed to the accident.  (**Ex. 4**, Garnsey Aff. ¶ 6; **Ex. 5**, Gordanier Aff. ¶ 7.)

26.     The first park ranger to arrive on the scene also concluded that alcohol use was a contributing factor to the accident.  (**Ex. 10**, Boating Accident Report Form at Bates No. Vogel 000558.)

27.     Standard received Plaintiff's claim for AD&D benefits on September 14, 2012.  (**Ex. 1**, Attachment 6 to Clark Aff., Claim Form, Bates No. STND 13-01951-305.)

28.     Standard requested a copy of the autopsy report on September 18, 2012 (**Ex. 1**, Attachment 7 to Clark Aff., Fax Cover Sheet, Bates No. STND 13-01951-301), and received the autopsy and toxicology reports on October 27, 2012.  (**Ex. 1**, Attachment 8 to Clark Aff., Coroner's Office email, Bates No. STND 13-01951-243)).

29.     Standard requested a copy of the sheriff's investigators' reports on September 24, 2012 (**Ex. 1**, Attachment 9 to Clark Aff., Claim Log, Bates No. STND 13-01951-00053), and received a copy of the sheriff's investigators' reports on October 22, 2012.  (**Ex. 1**, Attachments 4 & 9 to Clark Aff., Claim Log and Offense Report, Bates No. STND 13-01951-00053 & 244-249.)

30.     The sheriff's reports contain notes of interviews conducted by the investigators of the Watrouses, the Dewetts, and Plaintiff.  (**Ex. 1**, Attachment 3 to Clark Aff., Sheriff's Report, Bates No. STND 13-01951-251 – 265.)

31.     After reviewing the autopsy, toxicology, and sheriff's reports, Dr. Beeson concluded that alcohol likely caused or contributed to the Decedent's death because the Decedent's BAC caused gross motor impairment and a lack of judgment.  (**Ex. 1**, Attachment 10 to Clark Aff., Beeson Report, Bates No. STND 13-01951-00227 – 228.)

32.     On November 15, 2012, Standard notified Plaintiff that it had denied her claim.  (**Ex. 1**, Attachment 11 to Clark Aff., Letter, Bates No. 13-01951-00222 – 224.) Standard explained that the alcohol exclusion in the Policy applied because Standard's investigation showed that it was likely that alcohol "had caused or contributed to Mr.

Vogel's accident and death." (**Ex. 1**, Attachment 11 to Clark Aff., Letter, Bates No. STND 13-01951-00223.)

33.     On December 5, 2012, Plaintiff's counsel wrote to Standard and disputed the determination. (**Ex. 1**, Attachment 12 to Clark Aff., Letter, Bates No. STND 13-01951-00448 – 449.) Standard interpreted the letter as a request for review. (**Ex. 1**, Attachment 13 to Clark Aff., Letter, Bates No. STND 13-01951-00446 – 447.)

34.     On December 14, 2012, and again on December 31, 2012, Standard employee, Rob Clark, talked with the coroner, Dr. Michael Doberson. (**Ex. 1**, Attachment 9 to Clark Aff., Claim Log, Bates No. STND 13-01951-000052 – 3; **Ex. 11**, Deposition of Robert Clark at 84:1-16.)

35.     On December 18, 2012, Standard received the dive rescue report. (**Ex. 1**, Attachment 14 to Clark Aff., Dive Report, Bates No. STND 13-01951-00207.)

36.     On January 8, 2013, Standard requested a review of Plaintiff's claim by toxicologist Dr. Alan Weiner to determine whether "Mr. Vogel's use or consumption of alcohol caused and/or contributed to the accident and/or Mr. Vogel's death?" (**Ex. 1**, Attachment 15 to Clark Aff., Referral, Bates No. STND 13-01951-00176.)

37.     Dr. Weiner concluded "that it is more likely than not that the consumption of ethanol was an independent contributor to the drowning death" of the Decedent. (**Ex. 1**, Attachment 16 to Clark Aff., Weiner Report, Bates No. STND 13-01951-00164.)

38.     Dr. Weiner found that Decedent's level of intoxication would:

cause slower reaction times, altered sensory ability, altered thought processes, and impaired judgment. All of these effects could potentially affect the performance of a complex multi-step task, such as swimming to

the bottom of a lake and trying to free an anchor that may have been stuck
in the mud.

(**Ex. 1**, Attachment 16 to Clark Aff., Weiner Report Bates No. STND 13-01951-00166.)

39.    Notably, Dr. Weiner opines that "[w]hile it is true that some drugs, such as

ethanol, can affect different people to varying degrees, this reviewer believes that it is

possible to make an estimate regarding the effects that a given level of ethanol would

be expected to have on an individual" and he notes that "[e]thanol levels such as [the

level in the Decedent] would be expected to cause slower reaction times, altered

sensory ability, altered thought processes, and impaired judgment." (**Ex. 1**, Attachment

16 to Clark Aff., Weiner Report Bates No. STND 13-01951-00164, 166.)

40.    The only additional documents that Plaintiff submitted as part of the review

were written statements from the Watrouses and the Dewetts.  Those statements

confirmed that the Decedent had consumed alcohol, but claimed that Decedent "did not

appear intoxicated or impaired in his abilities." (**Ex. 1**, Attachment 17 to Clark Aff.,

Statements, Bates Nos. STND 13-01951-00381 & 382.)  Standard considered these

statements in reaching its decision.  (**Ex. 1**, Attachment 18 to Clark Aff., Letter, Bates

No. STND 13-01951-00112.)

41.    On April 12, 2013, Standard informed Plaintiff's counsel that Standard had

upheld the denial of Plaintiff's claim.  (**Ex. 1**, Attachment 18 to Clark Aff., Letter, Bates

No. STND 13-01951-00112.)  Standard explained that:

the documentation supports [the Decedent] had consumed enough
alcohol that it would have reasonably affected him physiologically (such as
in reaction times and sensory ability) and cognitively (altered thought
processes, impaired judgment and the ability to carry out multi-step
processes). Mr. Vogel may have been a strong swimmer and an athlete,

but the documentation of the events of that evening show his judgment and thought processes were impaired when he chose to jump into very cloudy/murky water when it was dark after he had been drinking in order to free an anchor that may have been stuck in the mud.

(**Ex. 1**, Attachment 18 to Clark Aff., Letter, Bates No. STND 13-01951-00112.)

## III.     LEGAL STANDARDS

"Summary judgment is appropriate if the moving party demonstrates that there is 'no genuine issue as to any material fact' and that it is 'entitled to a judgment as a matter of law.'" Doshay v. Global Cred. Collection Corp., 796 F. Supp. 1301, 1303 (D. Colo. 2011) (quoting Fed. R. Civ. P. 56(c)).   A fact is material if, under the applicable law, it is "essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670 (citing Anderson, 477 U.S. at 248).   Courts view the evidence and draw reasonable inferences therefrom in favor of the nonmovant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hirase-Doi v. U.S. West Comm'ns, Inc., 61 F.3d 777, 781 (10th Cir. 1995).

The movant bears the initial burden of making a prima facie showing that no genuine issues of material fact exist and that the movant is entitlement to judgment as a matter of law. See Celotex v. Catrett, 477 U.S. 317, 323 (1986).   The movant can meet its initial burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).   Thus, a movant that will not bear the burden of persuasion at trial

need not negate the nonmovant's claim.  See id. at 325.

Once the movant meets its initial burden, the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts to support its case.  See Adler, 144 F.3d at 671 (noting that burden shifts to nonmovant to "go beyond the pleadings").  To avoid summary judgment a nonmovant must set forth particular facts from which a rational trier of fact could find for the nonmovant.  See Adler, 144 F.3d at 671.

## IV.        ARGUMENT

### A.    PLAINTIFF'S BAD FAITH CLAIM SHOULD BE DISMISSED.

#### 1.    Plaintiff Must Prove that Standard Acted Unreasonably.

To state a claim for bad faith breach of insurance contract in a first-party case, an insured must prove that the insurer acted unreasonably **and** that the insurer knew its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable.  Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1272 (Colo. 1985); Peiffer v. State Farm Mut. Auto. Ins. Co., 940 P.2d 967, 970 (Colo. App. 1996) (same).

It is not unreasonable for insurers to challenge claims that are "fairly debatable." Zolman v. Pinnacol Assurance, 261 P.3d 490, 496 (Colo. App. 2011); Pham v. State Farm Mut. Auto. Ins. Co., 70 P.3d 567, 572 (Colo. App. 2003) (affirming summary judgment for insurers on bad faith claim when insurers had a reasonable belief they were not obligated under the applicable statute to pay benefits during the pendency of a related case); see also Savio, 706 P.2d at 1275 (quoting Anderson v. Continental Ins. Co., 271 N.W.2d 368, 377 (Wis. 1978)).  As the Colorado Supreme Court has held:

> If an insurer does not know that its denial of or delay in
> processing a claim filed by its insured is unreasonable, and

> does not act with reckless disregard of a valid claim, the insurer's conduct would be based upon a permissible, albeit mistaken, belief that the claim is not compensable.  While the distinction is subtle, recognition of the permissible scope of an insurer's right to refuse invalid claims requires the conclusion that in the context of a first-party claim the insured must establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted.

Savio, 706 P.2d at 1275-76.

Thus, courts can, and do, grant summary judgment dismissing bad faith claims when the undisputed facts show that the insurer denied a "fairly debatable" claim. Sanderson v. Am. Fam. Mut. Ins. Co., 251 P.3d 1213, 1218 (Colo. App. 2010) (affirming summary judgment in favor of insurer); Wausau Bus. Ins., 341 F. Supp. At 1186 (granting summary judgment in favor of insurer).

   2.   Plaintiff Cannot Show Unreasonable Conduct Because Application of the Alcohol Exclusion Was Fairly Debatable.

      a.   Review Process

In this case, the reasonableness of Standard's conduct turns on its decision to apply to the alcohol exclusion, which excludes AD&D coverage if the Decedent's voluntary consumption of alcohol caused or contributed to his accident or death. (Statement of Undisputed Material Facts ("SOF") ¶ 4.)  The Policy does not define "caused" or "contributed" but the Court should construe this exclusion according to the plain meaning of the words used and settled ideas of contract interpretation.  Allstate Ins. Co. v. Huizar, 52 P.3d 816, 820 (Colo. 2002).

Thus, the alcohol exclusion permits Standard to deny coverage if the Decedent's voluntary consumption of alcohol helped make his accident or death happen.  See

Merriam-Webster Online (to "cause" something means "to make something happen or exist"[1] and to "contribute" to something means "to help cause something to happen").[2]

Here, it is undisputed that Standard knew the Decedent had been drinking and that his BAC at the time of death was 0.128.  (SOF ¶¶ 7, 18.)  It is also undisputed that Standard had a copy of the Sheriff's report disclosing that beer, tequila, and several plastic cups were found in the boat. (SOF ¶ 17.)  The report also included statements about Decedent's level of intoxication obtained from other members of the boating party.  (SOF ¶ 9.)  And, it is undisputed that Standard obtained the opinions of two physicians, both of whom advised that alcohol would have impacted the Decedent's gross motor skills and impaired his judgment, and both of whom opined that alcohol caused or contributed to the Decedent's accident or death.  (SOF ¶¶ 31, 37, & 38.)

While Plaintiff may dispute Standard's decision, the underlying facts are not disputed and these facts show that the AD&D claim, and specifically whether alcohol helped to cause the Decedent's accident or death, was fairly debatable.[3]

> ### b.   Reasonable Disagreement

Any disagreement between Standard's toxicology reviewers and the toxicologist Plaintiff has endorsed does not, as a matter of law, support a claim for bad faith.

---

[1] Available at http://www.merriam-webster.com/dictionary/cause (last visited July 24, 2014).

[2] Available at http://www.merriam-webster.com/dictionary/contribute (last visited July 24, 2014).

[3] And, in any event, the issue in a bad faith claim is not – as Plaintiff will presumably assert – whether alcohol actually caused or contributed to the Decedent's accident or death, but whether application of the alcohol exclusion was fairly debatable.  See Thompson v. United States Fidelity & Guaranty Co., 559 N.W.2d 288, 292 (Iowa 1997) (question is whether application of intoxication defense is fairly debatable, not whether intoxication caused accident that gives rise to claim).

The first physician who reviewed Plaintiff's claim agreed that it was likely that Decedent's accident or death was caused or contributed to by the voluntary consumption of alcohol.  (SOF ¶ 31.)  He further explained that a person with the Decedent's BAC would have "significant motor impairment and loss of judgment. Speech and balance along with vision may also be impaired."  (SOF ¶ 31.)

The second physician, who specializes in toxicology, stated that "it is more likely than not that the consumption of ethanol was an independent contributor to the drowning death of the deceased on 8/25/12."  (SOF ¶ 37.)  "While it is true that some drugs, such as ethanol, can affect different people to varying degrees, this reviewer believes that it is possible to make an estimate regarding the effects that a given level of ethanol would be expected to have on an individual."  (SOF ¶ 39.)  That physician then explained that "[e]thanol levels such as these would be expected to cause slower reaction times, altered sensory ability, altered thought processes, and impaired judgment."  (SOF ¶ 39.)  This physician concluded that "the effects of ethanol did affect the deceased such that he was unable to return to the surface of the lake, which ultimately resulted in his death."  (SOF ¶ 37.)

The fact that Standard relied on these opinions from medical professionals in analyzing the alcohol exclusion is undisputed.  It is also undisputed that Plaintiff did not present any contrary medical opinions during the claim process.  Thus, Standard's conclusion, based on the medical opinions, that alcohol caused or contributed to the accident or the death was fairly debatable and not made in bad faith.

The testimony of the forensic toxicologist that Plaintiff endorsed after filing this

lawsuit further supports the conclusion that Plaintiff's AD&D claim was fairly debatable and that Standard did not act in bad faith.  For example,

- Plaintiff's expert agrees that the Decedent was intoxicated when he entered the water (SOF ¶ 19);

- She also agrees that alcohol would have had an effect on the Decedent and that his BAC was sufficiently high that Standard could conclude that he was likely experiencing the clinical effects of intoxication when he died (SOF ¶ 20);

- Based on voluminous studies involving of thousands of people, and given the Decedent's BAC when he died, the Decedent would likely have experienced "emotional instability, increased reaction time, sensory motor incoordination, impaired balance, slurred speech, vomiting and drowsiness" (SOF ¶ 21); and

- The Decedent would also likely have experienced "sociability, talkativeness, increased self-confidence, decreased inhibitions, diminished attention, judgment and control, some sensory motor incoordination, slow information processing, loss of efficiency in critical performance tests."  (SOF ¶ 23.)

Significantly, Plaintiff's expert does cannot say that alcohol did **not** contribute to the Decedent's accident or death.  Rather, she testified that there is a "lack of information" and she cannot "make a call as to whether or not alcohol in his system affected what – how he died."  (SOF ¶ 24.)  Indeed, Plaintiff's expert testified that although she does not know exactly what happened in the water that night, she agrees that "it's possible" that the Decedent's decision to swim down and free an anchor at night while drinking was the result of his "impaired judgment."  (SOF ¶ 24.)

Thus, although Plaintiff's expert may dispute whether there is sufficient evidence to reach the ultimate conclusion that alcohol caused or contributed to the Decedent's accident or death, it is clear that any disagreement is reasonable and that the AD&D claim was fairly debatable.  Since the claim was fairly debatable Standard did not act in bad faith and Plaintiff's bad faith claim should be dismissed.

3.     <u>Case Law Supports Standard's Application of the Alcohol Exclusion.</u>

In Colorado, an alcohol exclusion will apply when the insurer can show some causal connection between alcohol and the accident or loss.  <u>See Sylvester v. Liberty Life Ins. Co.</u>, 42 P.3d 38, 40-41 (Colo. App. 2001) (rejecting argument that alcohol must be "predominant cause" of death for alcohol exclusion to apply).   The consumption of alcohol need not be the only, or even the predominant, cause of the accident or death.  <u>See, e.g., id</u>, 42 P.3d at 41; <u>see also Lovette v. Stonebridge Life Ins. Co.</u>, 716 N.W.2d 743, 747 (Neb. 2006) (Nebraska law) (exclusion required that intoxication be **<u>a</u>** cause of the fatal event, not the **<u>only</u>** cause); <u>Likens v. Hartford Life Ins. Co.</u>, 688 F.3d 197, 202 (5th Cir. 2012) (applying Texas law) (insurer need only show that alcohol was proximate cause, not sole cause of death).

An insurer can avail itself of an alcohol exclusion by, among other things, relying on medical evidence and blood alcohol levels shown in autopsy reports.  <u>Sylvester</u>, 42 P.3d at 41 (affirming summary judgment when insurer showed causal connection between alcohol and death via medical testimony).   Since the facts uncovered by Standard in its investigation showed "some causal connection between alcohol and [the Decedent's] death," Standard's decision to apply the exclusion was fairly debatable under Colorado law.  <u>Sylvester</u>, 42 P.3d at 41.

Standard anticipates that Plaintiff will rely on <u>Kellogg v. Metropolitan Life Ins. Co.</u> 549 F.3d 818 (10th Cir. 2008).  <u>Kellogg</u>, however, is not on point.  First, the policy at issue in <u>Kellogg</u> was governed by ERISA.  <u>Id.</u> at 819.  Thus, the issue addressed in <u>Kellogg</u> was whether the claim was properly denied, not whether the carrier acted

reasonably or whether the claim was fairly debatable.  The standard is different here because even if the Court determines that Standard incorrectly denied the claim, that does not mean that Standard acted in bad faith.  <u>Thompson</u>, 599 N.W.2d at 292 (question is whether application of intoxication defense is fairly debatable, not whether intoxication caused accident giving rise to claim).  The court in <u>Kellogg</u> did not consider whether the carrier acted in bad faith, and thus, <u>Kellogg</u> is inapposite.

Second, there is a key difference between the policy at issue in <u>Kellogg</u> and the policy at issue here.  In <u>Kellogg</u>, the insured was killed in a car wreck that may have occurred because the insured had a seizure while driving.  <u>Id.</u> at 819-20.  The insurer denied coverage since the policy excluded "any loss caused or contributed to by . . . physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity."  <u>Id.</u> (quotation omitted).  The Tenth Circuit, however, reversed.  <u>Id.</u> at 832. The appeals court held that even if a seizure caused the car wreck, the "loss" under the policy terms, <u>i.e.</u>, the death, was caused by a skull fracture, not by the seizure.  <u>Id.</u> at 832-33.  Thus, the exclusion in <u>Kellogg</u> only applied if the seizure caused the "loss."  <u>Id.</u> at 821.  Here, however, the Policy excludes coverage if the "**accident** or Loss" is caused or contributed to by the Decedent's voluntary consumption of alcohol.  (SOF ¶ 4.)  Thus, the exclusion here is broader than the exclusion in <u>Kellogg.</u>

This Court has already recognized this critical distinction in policy terms.  <u>Cf. Pavicich v. Aetna Life Ins. Co.</u>, 2010 WL 3854733, *10 (D.Colo. Sept. 27, 2010) (insurance policy can be written to exclude coverage when medical condition causes accident or loss).  Because the policy in <u>Pavicich</u>, like the policy in <u>Kellogg</u>, did "not

exclude coverage for deaths resulting from **accidents** caused by 'a bodily or mental infirmity' or 'medical treatment,' such as medication," Pavicich granted summary judgment to an insured based from Kellogg.  Id.  Pavicich noted, however, that the insurer in that case could have excluded coverage for deaths resulting from **accidents** or losses caused by medical treatment.  Id.  Here, Standard followed Pavicich's suggestion by drafting the alcohol exclusion so that it would apply if the "**accident** or Loss" is caused or contributed to by the consumption of alcohol.  (SOF ¶ 4.)[4]

Third, while the plan documents at issue in Kellogg included both the "caused" and "contributed to" language, the court only considered whether the loss was caused by the seizure.  The court did not consider whether the loss was contributed to by the seizure or the impact of the contributed to policy language.  Id.[5]

---

[4] LaAsmar v. Phelps Dodge Corp. also does not apply here since LaAsmar merely followed Kellogg.  See 605 F.3d 789, 801-803 (10th Cir. 2010).

[5] A review of the appellate briefing in the Kellogg case helps to explain why the Tenth Circuit focused on whether the death was "caused" by a physical illness and did not analyze whether the death was "contributed" to by a physical illness.  First, the primary dispute in Kellogg was whether the death was caused by an accident.  The policy provisions related to whether there was an accident did not have the "contributed to" language.  (**Ex. 12**, Kellogg v. Metropolitan Life Ins. Co., Appellant's Brief at 26-28; **Ex. 13**, Kellogg v. Metropolitan Life Ins. Co., Appellees' Answer Brief at 16-20.)

Second, to the extent the issue was the application of the exclusion for physical illness, there was a difference between the exclusion language in the Summary Plan Description ("SPD") and the exclusion language in the Certificate of Insurance.  The SPD stated that the plan did not provide accidental death coverage for a death that is "due to:  physical . . . illness."  The Certificate of Insurance provided that accidental death benefits were not payable "for any loss caused or contributed to by:  physical . . . illness."  (**Ex. 13**, Kellogg v. Metropolitan Life Ins. Co., Appellees' Answer Brief at 20.)  Thus the SPD did not contain the "contributed to" language.  While the insurer in Kellogg briefly argued that both documents must be considered together, the insurer then focused exclusively on whether the facts showed that the seizure "caused" the collision.  (**Ex. 13**, Appellees' Answer Brief at 21 ("On the other hand, when taken in combination these three evidentiary bases create a convincing body of evidence demonstrating that a seizure **caused** the fatal collision, and, therefore, the Plan's exclusion for death due to physical illness barred Kellogg's claim for an accidental death benefit.").)  The lack of argument related to whether the seizure contributed to the collision was likely the result of two

Thus, <u>Kellogg</u> does not apply here, and Colorado case law supports Standard's decision to apply the alcohol exclusion and Standard's decision to deny Plaintiff's claim.

## V.      CONCLUSION

Standard's decision to apply the alcohol exclusion was, at the very least, fairly debatable and thus, Plaintiff can put forth no evidence that would permit a reasonable jury to find in Plaintiff's favor or her bad faith claim.  For the reasons above, Plaintiff's claim for bad faith should be dismissed.  A proposed order is attached for the Court's convenience.

DATED this 1st day of October, 2014.

Respectfully Submitted,

Polsinelli PC

*s/Thomas H. Wagner*
Stacy A. Carpenter, Esq.
Thomas H. Wagner, Esq.
Joseph T. VanLandingham, Esq.
1515 Wynkoop St., Ste. 600
Denver, CO  80202
303-572-9300
scarpenter@polsinelli.com
twagner@polsinelli.com
jvanlandingham@polsinelli.com
*Attorneys for Defendant Standard Insurance Co.*

---

things:  (1) a desire to avoid dispute over which policy document controlled; and (2) the failure of the insurer to cite the language from the Certificate of Insurance (which included the "contributed to" phrase) in the denial letter.  Neither of those issues arises in this case because the Policy is clear: Standard can deny coverage when alcohol causes or contributes to the accident or death.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was duly served this 1st day of October, 2014 to each of the following:

| | | |
|---|---|---|
| John H. Inderwish | ( ) | via U.S. Mail |
| Daniele W. Bonifazi | ( ) | via Hand Delivery |
| Inderwish & Bonifazi, P.C. | ( ) | via E-Mail |
| 1873 S. Bellaire Street, Suite 1401 | ( ) | via Overnight Mail |
| Denver, CO 80222 | (x) | via CM/ECF |
| *Counsel for Plaintiff* | | |

*s/Thomas H. Wagner*

Thomas H. Wagner